**No. 26-3276**

# *In the* United States Court of Appeals *for the* Eighth Circuit

KENIS ADALBERTO LOPEZ GONZALEZ,
*Plaintiff-Appellee*,
– v. –

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD BLANCHE, in his official capacity as Attorney General of the United States; MARCO RUBIO, in his official capacity as Secretary of State; SAMUEL OLSON, in his official capacity as Field Office Director, St. Paul Field Office, U.S. Immigration and Customs Enforcement,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Minnesota
Case No. 0:26-cv-04507, Hon. Jeffrey M. Bryan

## APPELLEE'S RESPONSE IN OPPOSITION TO APPELLANTS' MOTION FOR STAY PENDING APPEAL


SIMON SANDOVAL-MOSHENBERG
JAMES JUSTICE HAYNES
*Murray Osorio PLLC*
*4103 Chain Bridge Road*
*Fairfax, VA 22030*
*(703) 352-2399*

ELEANOR MICHELLE DRAKE
*Berger & Montague*
*1229 Tyler Street, N.E.*
*Minneapolis, MN 55413*
*(612) 594-5999*

PAUL W. HUGHES
MARY H. SCHNOOR
MICHAEL J. MESTITZ
VIRGINIA N. OAT
*McDermott Will & Schulte LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for Plaintiff-Appellee*
*Kenis Adalberto Lopez Gonzalez*

## TABLE OF CONTENTS


Table of Authorities .......... ii

Introduction .......... 1

Statement of the Case .......... 3

- A. Legal background .......... 3
- B. Factual background .......... 4
  - 1. Lopez received withholding of removal and was released under an Order of Supervision. .......... 4
  - 2. Defendants detained Lopez without following their own regulations, then removed him to the Central African Republic. .......... 5
  - 3. Lopez is at risk of violence, illness, and death in the CAR. .......... 6
- C. Proceedings below .......... 7

Argument .......... 10

I. No administrative stay is warranted .......... 10

II. Defendants are unlikely to succeed on the merits of their appeal. .......... 11

- A. The district court properly ordered facilitation of Lopez's return .......... 11
  - 1. Lopez was prejudiced by Defendants' unlawful revocation of his OSUP—without which his removal would not have been possible. .......... 11
  - 2. Defendants' violation of their regulations and due process is not moot. .......... 16
  - 3. The relief does not remedy a violation solely "in the past" because Lopez remains in the CAR. .......... 17
- B. The district court's narrow remedy does not implicate Section 1252 or *D.V.D.* .......... 18

III. The remaining factors do not favor a stay .......... 21

Conclusion .......... 24

## TABLE OF AUTHORITIES

**Cases**

*Abedi v. Carter*,
2026 WL 3149141 (10th Cir. Oct. 21, 2026)........................................14

*Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ........................................................1, 2, 13, 15

*Arc of Iowa v. Reynolds*,
24 F.4th 1162 (8th Cir. 2022), *vacated as moot*, 33 F.4th 1042.............22

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ..................................................................17

*D.V.D. v. U.S. Dep't of Homeland Sec.*,
No. 26-426 (U.S.)........................................................ 2, 8, 18, 20, 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................................................................19

*Doe v. Noem*,
778 F. Supp. 3d 1151 (W.D. Wash. 2025).............................................23

*Kansas v. United States*,
124 F.4th 529 (8th Cir. 2024)......................................................11

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..........................................................23

*Nazarian v. Noem*,
2025 WL 3236209 (C.D. Cal. Nov. 3, 2025)...........................................15

*Ng v. Bd. of Regents of Univ. of Minn.*,
64 F.4th 992 (8th Cir. 2023)........................................................23

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ....................................................................2

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................10, 22, 23

*Noem v. Abrego Garcia*,
145 S. Ct. 1017 (2025) ........................................... 2, 12, 13, 14, 19, 22

**Cases – continued**

*Puc-Ruiz v. Holder*,
629 F.3d 771 (8th Cir. 2010) .......................................................... 14

*Reno v. AADC*,
525 U.S. 471 (1999) ........................................................................ 19

*Santamaria Orellana v. Baker*,
2025 WL 2444087 (D. Md. Aug. 25, 2025) .................................... 12, 16

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) .................................................................... 21

*United States v. Texas*,
144 S. Ct. 797 (2024) ...................................................................... 10

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ........................................................................ 10

*Vitarelli v. Seaton*,
359 U.S. 535 (1959) ........................................................................ 13

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ........................................................................ 15

**Statutes**

8 U.S.C.
§ 1231(b)(3) ........................................................................................ 4
§ 1252 ................................................................................................ 18
§ 1252(a)(5) ....................................................................................... 19
§ 1252(b)(9) ....................................................................................... 19
§ 1252(g) ........................................................................... 18, 19, 20

**Regulations**

8 C.F.R.
§ 241.4 .................................................................................................. 3
§ 241.4(*l*) ........................................................................................ 3, 6
§ 241.13 ..................................................................................... 3, 14, 15
§ 241.13(*i*) .......................................................................... 3, 6, 11

## INTRODUCTION

Kenis Adalberto Lopez Gonzalez ("Lopez") fled Nicaragua because he feared government retaliation for his political advocacy. In the United States, an immigration judge granted him withholding of removal—recognizing the danger he would face if removed to Nicaragua—and DHS released him from immigration detention under an Order of Supervision (OSUP). He settled in Minnesota, where he worked legally and met every condition of his release.

Before the government may revoke an OSUP, governing regulations obligate it to make specific findings—and the government must provide a noncitizen notice of those findings and an opportunity to contest them. But, in January 2026, Defendants took Lopez into custody in violation of these crystal-clear regulations. After seven-and-a-half months, during which they never gave him the requisite process, Defendants forcibly removed him to the Central African Republic (CAR)—a country a world away, where he has no conceivable tie.

Defendants did not dispute below that they violated the regulations governing revocation of Lopez's OSUP. The court thus found Lopez likely to succeed on his claims that, in taking him into custody, Defendants violated *Accardi v. Shaughnessy*, the APA, and procedural due process.

Because Lopez satisfied the other preliminary injunction factors, the court ordered relief tailored to return Lopez to the *status quo ante* that preceded Defendants' violation of his rights. That relief is just what the Supreme Court has recently approved: An order requiring the government to "facilitate" a noncitizen's return from abroad "and to ensure that his case is handled as it would have been had he not been improperly" detained and removed. *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

Defendants' remaining quarrels with the injunction (at 3-4) lack merit. The district court's order rests not on "skepticism" of diplomatic assurances from the CAR but on unrebutted evidence that Lopez faces harms outside that government's control. The order does not "require[] Defendants to take Lopez into custody"; it requires Defendants to return him to his prior status of *release* under his OSUP. And the issues here are wholly separate from those in *D.V.D.*; the district court addressed only Lopez's OSUP claims, which are not presented in *D.V.D.*

In all, "[i]f men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). The court's relief is not novel; *Accardi* supports it, and the Supreme Court approved the same relief in *Abrego Garcia*. Because neither the record nor the law supports a stay, the Court should deny Defendants' motion.

## STATEMENT OF THE CASE

### A. Legal background

Noncitizens subject to a final order of removal may be released from detention under an OSUP when DHS determines that certain criteria are satisfied and no special circumstances justify continued detention. 8 C.F.R. § 241.4; *id.* § 241.13.

DHS regulations impose substantive and procedural requirements governing the agency's revocation of a noncitizen's release under an OSUP. Substantively, as relevant here, it can revoke release only if a noncitizen violates a condition of release or DHS shows changed circumstances. 8 C.F.R. §§ 241.13(*i*)(1)-(2). Procedurally, DHS must notify the noncitizen "of the reasons for revocation of his or her release" and "conduct an initial informal interview promptly … to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification." *Id.* § 241.13(*i*)(3). DHS must then conduct a "revocation custody review," which includes "an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." *Id.*[1]

[1] Defendants have not disputed that both Sections 241.4 and 241.13 governed Lopez's OSUP. Section 241.4(*l*) similarly requires a notice and interview as part of any OSUP revocation, and Defendants have not shown they were permitted to revoke under that section or complied with those requirements either.

### B. Factual background

Lopez, a political activist, fled Nicaragua because he feared government retaliation. Doc. 30 (PI Op.) at 2; Doc. No. 1-6 ¶ 1 (Lopez Decl.). He entered the United States at the U.S.-Mexico border in 2022 and immediately presented himself to immigration authorities, who paroled him into the country. PI Op. 2; Doc. 20-6, at 2. He settled in Minnesota and applied for asylum. *Id.*

#### 1. *Lopez received withholding of removal and was released under an Order of Supervision.*

In May 2024, ICE detained Lopez at a scheduled check-in and reinstated a 2005 removal order. PI Op. 2-3. In August 2024, an immigration judge (IJ) granted his request for withholding under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture. Doc. 1-2, at 2 (IJ Order).

Shortly thereafter, ICE released Lopez from detention under an OSUP, permitting him to leave ICE custody and return to the community. Doc. 20-1, at 2. The OSUP required Lopez to, among other things, report to ICE when directed, notify ICE of changes in residence or employment, and avoid any criminal activity. *Id.* at 1, 3.

No one disputes that Lopez fully complied with these terms. PI Op. 3. He also received work authorization and started a small construction business. *Id.* at 3-4. He paid taxes, obtained a Minnesota REAL ID driver's license, and regularly attended church. *Id.* at 3.

2. *Defendants detained Lopez without following their own regulations, then removed him to the Central African Republic.*

On the morning of January 15, 2026, several ICE agents approached Lopez in his driveway, asking whether he was a U.S. citizen. PI Op. 3-4. Lopez told them he was not, but that he had been granted withholding. *Id.* The agents confiscated his documents, handcuffed him, and drove him away. *Id.*

Defendants flew Lopez to El Paso, Texas, that night. PI Op. 4. Over the following months, they moved him through several detention centers. Eventually, he was able to reach counsel, who filed a habeas petition on his behalf. *Id.* at 5. Despite that pending petition, ICE transported him in the middle of the night on August 24, 2026, to a detention facility in another jurisdiction. *Id.*

On August 28, 2026—seven-and-a-half months after Lopez was detained—agents shackled Lopez and other detainees and loaded them onto a bus. PI Op. 6. After several hours, the agents informed Lopez—a Nicaraguan—that he was being deported to the Central African Republic (CAR). *Id.* Lopez told the agents he was afraid to go to the CAR and again explained that he had withholding of removal, a pending habeas petition, and had never received any documents notifying him he would be deported to the CAR. *Id.* The agents laughed and said it was not their problem. *Id.*; Lopez Decl. ¶ 16. When Lopez and other detainees continued to express fear of

being removed to the CAR, armed agents told them they had to get off the bus "the easy way or the hard way." Lopez Decl. ¶ 17; PI Op. 6-7. Eventually, an ICE supervisor boarded the bus, and Lopez reiterated his fear, to which the ICE supervisor responded it was "not my business." PI Op. 6. Lopez pleaded that he "would rather die there where [his] family was." *Id.* The supervisor responded, in substance, that "they could kill [the detainees] right there." *Id.* at 7. Agents ultimately shot the still-shackled detainees with rubber bullets from close range, forcing them off the bus and onto an airplane bound for the CAR. PI Op. 7, 9; *see* Doc. 1-7, at 2-9 (photographs of Lopez's injuries).

In the months between Lopez's detention and removal, no government official took any of the steps 8 C.F.R. §§ 241.4(*l*) or 241.13(*i*) required to revoke Lopez's OSUP. PI Op. 8, 22-23 & n.9.

### 3. *Lopez is at risk of violence, illness, and death in the CAR.*

Lopez's sworn declaration describes the conditions in the CAR. Lopez was not processed by any authorities on arrival nor issued any papers. PI Op. 12. He has been housed in an unmarked building with several other deportees. *Id.* at 12-13. The building's armed guards warned the deportees that they could not leave because local police could kill them or sell their organs, or armed groups could kidnap them because they came from the United States. *Id.* at 13.

These warnings are well-founded. The State Department has assigned the CAR its highest travel warning—Level 4, "Do Not Travel"—and advises against traveling there "for any reason" due to unrest, violent crime, kidnapping, terrorism, serious health risks, and the threat of armed conflict, much of which is outside the government's control. PI Op. 9-11.

Lopez and other deportees rely on the International Organization for Migration (IOM), a humanitarian NGO, for food, water, and all other necessities. PI Op. 12-13. Lopez fears that instability in the CAR could prevent IOM from providing these necessities. *Id.* at 14. He also fears contracting malaria, which has already hospitalized eight deportees who arrived with him and can be fatal if not promptly treated. PI Op. 14 & n.5.

No one has told Lopez how long he will remain in the CAR. PI Op. 14. The CAR's "diplomatic assurances" to the U.S. State Department allow the CAR to send deportees to other countries. Doc. 19-1, at 1; PI Op. 14-15. IOM has offered only to help Lopez return to Nicaragua, but he would face persecution and torture there. Lopez Decl. ¶ 29.

### C. Proceedings below

Lopez filed this action in the District of Minnesota, challenging (as relevant here) Defendants' revocation of his release under the OSUP without following applicable regulations and their continued retention of his identification documents. Compl. ¶¶ 133-168.

The district court granted Lopez's motion for a preliminary injunction, concluding that Lopez had demonstrated that "he likely will prevail on the merits of his claims that Defendants violated the APA, constitutional Due Process and their own regulations when they took Lopez into custody without following applicable procedures to revoke [his] OSUP." PI Op. 25.

Defendants' noncompliance with their own regulations was undisputed. They did not "contest the factual statements concerning the violations … or the failure to provide any process at all concerning the OSUP." PI Op. 24. They "neither suggest[ed] nor provid[ed] documentation that they complied or even attempted to comply with" the regulations (PI Op. 24), nor did the record contain "sufficient, if any, evidence showing that Defendants considered the [required] factors … prior to making the initial determination to detain Lopez" (PI Op. 23).

Defendants argued below that Lopez could not succeed because he was a class member in *D.V.D. v. U.S. Department of Homeland Security*, No. 26-426 (U.S.). The district court, however, premised relief *only* on Lopez's OSUP claims, which are unrelated to the claims in *D.V.D.* Indeed, it confirmed it was not addressing anything beyond the OSUP claims, and would consider staying, severing, dismissing, or transferring "the claims that are sufficiently similar to those in *D.V.D.*" on either party's motion. PI Op. 26 n.14 & 30.

The district court also found that Lopez would suffer irreparable harm in the CAR, and this factor "heavily" favored relief. PI Op. 17, 20. As a result of Defendants' "revocation of his OSUP without the process he was due under DHS regulations or the Constitution," Lopez faced several harms substantiated by his sworn declaration, including malaria, violence from non-state actors, and the potential for disruption of aid from IOM. PI Op. 17-20. The district court's order did not question the CAR's diplomatic assurances; on the contrary, it noted they failed to address the harms Lopez faces. PI Op. 17-20.

The district court therefore required Defendants to "facilitate" Lopez's return and ordered Defendants to "restore Lopez to the conditions of the OSUP in effect before his detention." PI Op. 28-29. The injunction does not prohibit Defendants from again detaining or initiating proceedings against Lopez upon his return. PI Op. 29.[2]

The government filed an emergency motion for a stay pending appeal (Doc. 31), which Lopez opposed (Doc. 39). The district court denied the motion in a thoroughly reasoned opinion. Doc. 42 (Stay Op.).

---

[2] While Defendants are free to proceed against Lopez upon his return, the injunction prevents them from removing him from the District "while this matter is pending." PI Op. 29. This preliminary relief is routine, and Defendants' motion focuses on the "facilitation-of-return" remedy. But if there is any doubt about this conclusion, any stay should be narrowly limited to this issue.

## ARGUMENT

### I. No administrative stay is warranted.

The Court should deny Defendants' request for an administrative stay. "Once the court is equipped to rule" on a stay pending appeal, an administrative stay is inappropriate and "its obligation to apply the *Nken* factors is triggered." *United States v. Texas*, 144 S. Ct. 797, 799 (2024) (Barrett, J., concurring). Lopez has promptly responded, so an administrative stay is unnecessary.

Tellingly, Defendants do not argue their appeal may become wholly moot absent an administrative stay. Nor could they. Even if Lopez returns while the stay motion remains pending, the injunction will continue to govern his presence in the United States, so its terms will not "have been fully and irrevocably carried out." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 398 (1981). Defendants argue only (at 8) that Lopez's return would prevent the Court from addressing the facilitation-of-return remedy. But because Defendants object to that remedy not only as preliminary relief but also on the ultimate merits, *see* Mot. 9-17, they can continue to press that challenge after Lopez returns by arguing the injunction must be vacated.

And though they argue in passing (at 8) they will suffer harms during briefing, they have identified none. *See infra*, pp. 21-22.

## II. Defendants are unlikely to succeed on the merits of their appeal.

A stay pending appeal is "not a matter of right," but "an exercise of judicial discretion." *Kansas v. United States*, 124 F.4th 529, 533 (8th Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). The movant bears the burden, and the most important factor is a "likelihood" of success on the merits, and showing only a "possibility" is insufficient. *Id.*

### A. The district court properly ordered facilitation of Lopez's return.

Defendants cannot show a likelihood of success here.

#### *1. Lopez was prejudiced by Defendants' unlawful revocation of his OSUP—without which his removal would not have been possible.*

**a.** Defendants first argue (at 10-14) that Lopez was not "prejudiced" by their violation of the requirements for revoking his OSUP. They do not dispute the substance of those requirements. *See* Mot. 11-12; PI Op. 22-23; *supra*, p. 3 n.1. Rather, they assert only that changed circumstances *could* have allowed them to revoke Lopez's OSUP. Mot. 12-13. But even assuming that fact, Defendants do *not* dispute they gave Lopez no notice of reasons for revocation, no opportunity to respond, and no revocation custody review. *See* 8 C.F.R. § 241.13(*i*)(3) (requiring these steps). Thus, even if ICE had reason to revoke the OSUP (and there is no evidence it did), Defendants still

violated Lopez's right to notice and an opportunity to challenge the revocation.

This demonstrates both that Lopez was prejudiced and that his injury is related to "the relief he requests." *Contra.* Mot. 10. If Defendants could not lawfully revoke Lopez's release in the first place, or had to release him again after providing the process due, they could not have forced him onto the flight to the CAR.

Put simply: Defendants cannot remove a noncitizen like Lopez without first properly revoking his OSUP and taking him into custody. Law and logic agree: Logically, Defendants cannot put noncitizens on a flight without first detaining them. And legally, an OSUP confers protections that Defendants cannot abridge. *See Santamaria Orellana v. Baker*, 2025 WL 2444087, at *6 (D. Md. Aug. 25, 2025) (discussing OSUP revocation). Here, because Defendants failed to follow the required process, they lacked the power to detain Lopez—and thus to subsequently remove him. The appropriate remedy is to restore Lopez to his status before the wrongful revocation deprived him of his rights, which means facilitating his return from the CAR and reinstating his OSUP.

This is not novel relief. In *Noem v. Abrego Garcia*, the Supreme Court declined to stay an order requiring the government to "facilitate" a noncitizen's return from abroad "and to ensure that his case is handled as it would

have been had he not been improperly" removed. 145 S. Ct. at 1018. This remedy was appropriate even though the government could potentially remove him again through lawful process.

Similarly, *Accardi* itself held the government must follow its own procedures before removing a noncitizen. *Accardi v. Shaughnessy*, 347 U.S. 260, 266 (1954). The Supreme Court rejected the argument that the agency might nonetheless decide to deport the petitioner after the appropriate process. *Id.* at 268. Even so, the Court concluded, "at least he will have been afforded that due process required by the regulations in such proceedings." *Id.*

In *Vitarelli v. Seaton*, comparably, the government wrongfully discharged an employee it could have fired summarily and without cause. 359 U.S. 535, 539 (1959). Because the government relied on security regulations as the reason for his dismissal—but failed to follow the notice-and-hearing procedures required (*id.* at 540-544)—the Court held the dismissal was "illegal and of no effect," ordering the employee's reinstatement "subject … to any lawful exercise of the Secretary's authority hereafter to dismiss him." *Id.* at 545-546.

The district court's order follows the same pattern here: requiring Defendants to facilitate Lopez's return and restore his OSUP but leaving them free afterward if they follow the law. PI Op. 29-30. In sum, Lopez's case will

be "handled as it would have been had he not been improperly" detained in violation of his OSUP—and, by virtue of that unlawful revocation, subsequently removed. *Abrego Garcia*, 145 S. Ct. at 1018.

**b.** Defendants also argue (at 11-12) that their failure to comply with their regulations did not prejudice any interest those regulations "w[ere] designed to protect." Defendants rely on *Puc-Ruiz v. Holder*, 629 F.3d 771, 780 (8th Cir. 2010), which has no bearing here. There, this Court quoted the BIA's interpretation of a harmless-error evidentiary rule. But *Puc-Ruiz* says nothing about the denial of process Lopez suffered, and acknowledged that "prejudice may be presumed" when compliance with a regulation is mandated by the Constitution (*id.* at 780)—as is the case of Lopez's due-process rights here.

As Defendants concede (at 11 n.4), the Tenth Circuit in *Abedi v. Carter* addressed this very question. 2026 WL 3149141, at *24. (10th Cir. Oct. 21, 2026). It held that "the Government's failure to abide by the procedural requirements of § 241.13" warranted invalidating the agency's action regardless of actual prejudice. *Id.*[3] And, regardless, *Abedi* additionally held the

[3] Defendants claim (at 11 n.4) *Abedi* is distinguishable because the petitioner "remained in ICE custody." In fact, Abedi was released on a renewed OSUP. 2026 WL 3149141, at *3. And nothing about the court's prejudice holdings turned on that issue.

petitioner did suffer actual prejudice when defendants denied him the protections afforded by the regulations because, like Lopez, "he was held for months in detention without the ability to contest the basis for his detention or to otherwise be heard." *Id.*

Defendants suggest elsewhere (at 15) that Lopez has not "shown" their compliance with the required procedures would have prevented his removal. This retreads their prejudice argument. And it overlooks that § 241.13 "places the burden *on ICE* to establish that 'changed circumstances' justified the revocation of release." PI Op. 23 (emphasis added). Given Defendants' failure to introduce any evidence on this point, there is strong reason to believe that Lopez could have successfully challenged the OSUP revocation, thereby averting further detention. And, as noted in *Accardi*, the deprivation of process is prejudice in itself, regardless of outcome.

**c.** Finally, Defendants' violation of Lopez's due process rights independently shows prejudice. The district court held that Defendants violated Lopez's "constitutional Due Process" rights. PI Op. 25. In *Zadvydas v. Davis*, the Supreme Court held that constitutional due process protects the liberty of noncitizens, even those subject to a final removal order. 533 U.S. 678, 690 (2001). Thus, as many courts have held, "a noncitizen under an OSUP has a constitutional liberty interest in their continued release from immigration detention" (*Nazarian v. Noem*, 2025 WL 3236209, at *3 (C.D. Cal. Nov. 3,

2025) (collecting cases)), and the regulations governing revocation of OSUP "plainly provide due process protections to aliens … as they are considered for continued detention, release, and then possible revocation of release" (*Santamaria Orellana*, 2025 WL 2444087, *6). Depriving Lopez of those protections prejudiced him.

2. *Defendants' violation of their regulations and due process is not moot.*

Defendants next argue (at 14-16) that Lopez's challenges to his OSUP revocation are moot because they have already removed him. Much of this argument (at 15-16) rehashes Defendants' prior arguments and fails for the reasons already addressed.

Two further misstatements warrant correction. First, Defendants argue (at 14) that "the only relief" appropriate "is release from custody pursuant to a habeas petition," acknowledging that "many courts addressing [Defendants'] failures to comply with those procedures have ordered release." This proves Lopez's point: if Defendants could not have lawfully detained him, they could not have removed him, because his detention was a necessary condition to their ability to remove him to the CAR. Moreover, as Defendants concede (at 13 n.5), they removed him *while his habeas petition on this basis was pending*. Defendants lack any authority supporting the perverse rule that removal makes an unlawful revocation of release irremediable. Second, Defendants (at 15) wrongly claim that the injunction

"iron[ically] ... requires" them to take Lopez into custody "so that the legality of that judicially created custody can then be reviewed." Not so: it requires them to facilitate Lopez's return to Minnesota and restore his OSUP—that is, his *release on supervision*, not custody. PI Op. 29-30.

#### 3. *The relief does not remedy a violation solely "in the past" because Lopez remains in the CAR.*

Defendants finally assert (at 16-17) that facilitation-of-return is an improper remedy here because "any failure to follow the OSUP regulations … lacks any prospective effect" and "a past violation of those regulations has no continuing future effect." They cite *City of Los Angeles v. Lyons*, which held that past illegal conduct does not warrant injunctive relief "if unaccompanied by any continuing, present adverse effects." 461 U.S. 95, 102-103 (1983) (citation omitted).

Lopez still faces "continuing, present adverse effects" from the wrongful revocation of his OSUP (*Lyons*, 461 U.S. at 102-103): Defendants took him into custody and subsequently removed him to the CAR, where he remains and is likely to suffer irreparable harm. PI Op. 9, 18-20. Without the relief ordered, he cannot re-enter the United States or regain his OSUP. The district court's injunction thus remedies the ongoing adverse effects of Defendants' unlawful acts.

### B. The district court's narrow remedy does not implicate Section 1252 or *D.V.D.*

As Defendants acknowledge, the district court's injunction provided that "[n]othing in [its] Order shall be construed to, and does not, adjudicate the validity of the IJ's order for Lopez's removal." Mot. 17; PI Op. 30. Defendants nonetheless argue that "any attempt to conceive of the alleged OSUP violation as invalidating the removal order" would be barred by statute and inconsistent with *D.V.D.* Because Lopez does not challenge his removal order, Defendants' argument is irrelevant. And to the extent Defendants contend that "a remedy that undoes a removal" necessarily "invalidat[es] the removal order" (at 17), that is incorrect. The OSUP claims do not implicate Section 1252 because they do not "arise from" the removal order or its execution. Nor do they fall within the scope of the stay in *D.V.D.*, which has nothing to do with OSUP revocation.

**1.** Defendants first argue (at 18-23) that Lopez's OSUP claims fall under 8 U.S.C. § 1252(g), which deprives district courts of jurisdiction to review "any cause or claim by or on behalf of an[y] alien arising from the decision or action by the Attorney General to … execute removal orders against any alien under this chapter." Mot. 18 (quoting 8 U.S.C. § 1252(g)). But Lopez's OSUP claims fall outside the straightforward text of that provision because they do not "aris[e] from" a decision to "commence proceedings, adjudicate cases, or execute removal orders." Instead, they "arise from"

Defendants' violations of their OSUP regulations, the APA, and due process. That conduct—not anything about the Attorney General's subsequent execution of the removal order—forms the basis of Lopez's OSUP claims.

The Supreme Court has held that Section 1252(g) is a "narrow[]" bar cabined "to three discrete actions": a decision "to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Reno v. AADC*, 525 U.S. 471, 482 (1999). Thus, it has "rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (citation omitted). Defendants' contrary interpretation would read out the statute's "arising from" language entirely. Indeed, their own description (at 18) confirms the mismatch—Section 1252(g) "deprive[s] district courts of jurisdiction" over certain *claims* but says nothing about the *remedies* a court may impose. Defendants' argument (at 19-20) proves too much. If Section 1252(g) categorically barred requiring the government to "facilitate" return, even in habeas, *Abrego Garcia* could not have permitted that relief. 145 S. Ct. at 1018.[4]

**2.** Defendants also invoke Sections 1252(b)(9) and (a)(5) to argue (at 23-24) that this suit presents "questions of law and fact … arising from [an]

---

[4] Each case on which Defendants rely (*Hamama*, *Rauda*, *Camarena*, and *Silva*) involved a claim "arising from" the execution of a removal order.

action taken or proceeding brought to remove an alien." This argument fails for the same reasons as their reliance on Section 1252(g)—Lopez's OSUP claims do not "aris[e] from" any action taken or proceeding brought to remove him. As Defendants admit, "claims regarding detention" are "not unreviewable" under these provisions, even if detention ultimately furthers a noncitizen's removal. Mot. 24 (citing *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) (plurality op.)).

**3.** Although Defendants suggest in passing (at 17) that the *D.V.D.* stay bars the district court's order, they never develop that argument. Regardless, it is incorrect.

*D.V.D.* involves no claims about OSUP revocation, the sole basis for the injunction here. Stay Op. 7. Indeed, the court reserved ruling on any claims resembling those in *D.V.D.* and made clear nothing in its order addressed DHS's policy of third-country removals. *Supra*, p. 8.

Put differently, Lopez's revocation-of-release claims are independent of the issues in *D.V.D.* He would have the same claims arising from his OSUP revocation if he remained in ICE custody or had been removed to Nicaragua. That Defendants removed him to a third country *in addition* to wrongfully revoking his OSUP does not preclude him from securing relief. A contrary result would be absurd. It would let Defendants violate any law,

so long as the violation led to a third-country removal while *D.V.D.* is pending, and then argue that no court can redress the violation because the noncitizen belongs to the *D.V.D.* class—even if, as here, the government's action was unlawful for reasons unrelated to that case.

**III. The remaining factors do not favor a stay.**

**a.** A stay pending appeal also requires irreparable injury. But Defendants have not made that showing here. They argue (at 24-25) that the remaining stay factors favor them because the Supreme Court granted a stay in *D.V.D.* But the *D.V.D.* stay orders articulate no reasons, and the Supreme Court was likely concerned with the class-action vehicle in that case, because the government argued there that class members must pursue their claims, if at all, individually. U.S. Application for Stay at 17-18, U.S. Dkt. 26A406; U.S. Application for Stay at 5-6, U.S. Dkt. 24A1153. Regardless, even if interim orders "inform how a court should exercise its equitable discretion in like cases," this case differs from *D.V.D.* in every "pertinent respect": the claim, the regulations, the conduct challenged, the posture, and the relief sought. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

Nor does the injunction harm any foreign relations or diplomatic process. *Contra* Mot. 25-27. It says nothing about the United States' relationship with the CAR or the CAR's diplomatic assurances. Plainly, an order to

"facilitate" a noncitizen's return does not necessarily infringe on foreign affairs, as *Abrego Garcia* shows. 145 S. Ct. at 1018. That case involved even greater risk to foreign relations than this one, because Abrego Garcia was in a foreign government's custody, while Lopez was received by IOM. PI Op. 12-14. And the injunction requires nothing from the CAR's government: every step runs through U.S. actors. PI Op. 28-29.

Defendants' assertions (at 3, 27) that the district court disbelieved the CAR's diplomatic assurances are overstated and beside the point. The assurances address only persecution and torture, but the irreparable harm Lopez is likely to suffer arises from other factors, including that he lacks any legal status, is exposed to malaria, is at risk of violent crime, and is subject to disruption of food and water. PI Op. 19-20. It is *those* harms, not any potential harm from the CAR's government, that the district court found warranted injunctive relief.

**b.** The requested stay would also irreparably injure Lopez. *See Nken*, 556 U.S. at 426. The irreparable harms the district court identified threaten Lopez while he remains in the CAR. *See* PI Op. 19-20; *see also, e.g.*, *Arc of Iowa v. Reynolds*, 24 F.4th 1162 (8th Cir. 2022), *vacated as moot*, 33 F.4th 1042 (exposure to illness constituted irreparable harm). Moreover, Defendants violated Lopez's due process rights, and "the denial of a constitutional

right is … an irreparable harm." *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023) (citation omitted).

Defendants (at 22, 27) dismiss the district court's findings as its "own research," but those findings are rooted in Lopez's unrebutted sworn declaration. PI Op. 13-14. The only "country conditions" the court cited were *in addition* to the harms listed there, and came from the government's own publications, of which the court took judicial notice. *Id.* at 9-11 & n.4; Stay Op. 9 n.6. And though Defendants assert (at 27) that Lopez will not suffer "persecution or torture," the question is whether Lopez is likely to suffer irreparable harm under *the preliminary-injunction standard*, not whether any harms support relief under the Convention Against Torture. PI Op. 17-18.

**c.** The final stay factor is "where the public interest lies." *Nken*, 556 U.S. at 426. Defendants do not address this at all, and for good reason—the public interest weighs against any stay. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Here, "the public has a strong interest in having a government that conducts itself fairly and according to its stated regulations and policies." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1166 (W.D. Wash. 2025) (citation modified).

## CONCLUSION

The Court should deny Defendants' motion.

Dated: November 15, 2026

Respectfully submitted,

/s/ *Paul W. Hughes*

PAUL W. HUGHES
MARY H. SCHNOOR
MICHAEL J. MESTITZ
VIRGINIA N. OAT
*McDermott Will & Schulte LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

SIMON SANDOVAL-MOSHENBERG
JAMES JUSTICE HAYNES
*Murray Osorio PLLC*
*4103 Chain Bridge Road*
*Suite 300*
*Fairfax, VA 22030*
*(703) 352-2399*

ELEANOR MICHELLE DRAKE
*Berger & Montague*
*1229 Tyler Street, N.E.*
*Suite 205*
*Minneapolis, MN 55413*
*(612) 594-5999*

*Counsel for Plaintiff-Appellee*
*Kenis Adalberto Lopez Gonzalez*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this response in opposition:

(i) complies with the type-volume limitation of Rule 27(d)(2)(A) because it contains 5,197 words; and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6), as incorporated in Rule 27(d)(1)(E), because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: November 15, 2026 /s/ *Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2026, I electronically filed the foregoing response in opposition with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: November 15, 2026 /s/ *Paul W. Hughes*